UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES – GENERAL          'O'

| Case No. | 2:17-cr-00729-CAS-1 | Date | March 22, 2018 |
|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | | |
| Interpreter | N/A | | |

| Catherine Jeang | Not Present | Roger Hsieh, Not Present<br>MiRi Song, Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter /<br>Recorder, Tape No.* | *Assistant U.S. Attorneys* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond. | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| John Christopher Magdirila | NOT | X | | Charles Brown, DFPD | NOT | | |

**Proceedings:** (IN CHAMBERS) - DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS (Dkt. 25, filed February 7, 2018).

## I.  INTRODUCTION

On November 21, 2017, defendant John Christopher Magdirila was indicted on five counts of passing, uttering, and possessing counterfeit obligations of the United States with intent to defraud in violation of 18 U.S.C. § 472 and one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).  Dkt. 11.  Trial is scheduled to commence on May 15, 2018.  Dkt. 30.

On February 7, 2018, defendant filed the instant motion to suppress all evidence and statements obtained as a result of his allegedly unlawful arrest, search, and questioning by officers of Inglewood Police Department ("IPD") on October 23, 2017.  Dkt. 25 ("Motion").  On February 14, 2018, the government filed an opposition.  Dkt. 27 ("Opp'n").  Defendant did not file a reply.  The Court held a hearing on the motion to suppress on March 5, 2018.

After carefully considering the parties' arguments, the Court finds and concludes as follows.

## II.  BACKGROUND

### A.  Officers' Declarations and Police Report

On October 23, 2017, IPD Officers Robinson and Villicana were providing extra patrol in the area around the intersection of 10th Avenue and 104th Street in Inglewood, California, due to increased gang activity and recent reports of armed robberies.  Dkt. 27-1, Declaration of Mark Robinson ("Robinson Decl.") ¶ 3.  At approximately 10:50 p.m., Robinson observed a

black Infiniti G35 (the "Infiniti") stopped in an alley. The Infiniti's engine was running and its rear brake lights were illuminated as if the driver had his foot on the brake. Id. ¶ 6. The police report states that the way the Infiniti was parked was a violation of Inglewood Municipal Code 3-50.[1] Id., Ex. 1 at 9. Robinson also noted that the Infiniti had no license plates, a violation of California Vehicle Code ("Vehicle Code") section 5200(a). Robinson Decl. ¶ 6 & Ex. 1 at 9.

Based on these observations, Villicana activated the patrol car's overhead lights and sirens. At this time, the passenger (later identified as "D.R.") exited the Infiniti from the front passenger door, seemingly to leave the area. Dkt. 27-2, Declaration of Tyler Villicana ("Villicana Decl.") ¶ 5. Villicana told the passenger that he was being detained as a result of a traffic stop and asked the passenger to walk over to the patrol vehicle. Id. He then asked the passenger if he was on parole and received an affirmative response, and he handcuffed the passenger pending further investigation. Id.

Robinson approached the Infiniti and observed that defendant was sitting in the driver's seat with the keys in the ignition, the engine running, and his foot on the brake. Robinson Decl. ¶ 8. Robinson asked defendant if he had driver's license, to which defendant replied that he did not. Id. Defendant also stated that the Infiniti did not belong to him, but rather to a "friend." Id. Robinson asked defendant to exit the vehicle, handcuffed him, and detained him pending further investigation. Id. Because defendant was in the driver's seat with the engine running and his foot on the brake, the officers determined that he was in "operational control" of the vehicle. Dkt. 27–1 & Ex. 1 at 10.

Villicana ran a warrants inquiry on defendant and the passenger and confirmed that defendant had not been issued a driver's license in violation of Vehicle Code § 12500(a) ("A person may not drive a motor vehicle upon a highway, unless the person then holds a valid driver's license issued under this code . . . ."). Villicana Decl., ¶ 6. The inquiry also confirmed that the passenger was on parole and that he was subject to search as part of the conditions of his parole. Id. Defendant and the passenger were detained pending further investigation. Robinson Decl., ¶ 8; Villicana Decl., ¶ 5.

Robinson searched the Infiniti's glove compartment and found a bag of a white crystalline substance resembling methamphetamine. Robinson Decl., ¶ 10. He asked defendant and the passenger who owned the bag, and the defendant responded: "That's mine sir." Id., Report at 10. At this point, Robinson decided to arrest defendant and take him into custody for possession of a methamphetamine in violation California Health and Safety Code § 11377(a).[2]

---

[1] Inglewood Municipal Code 3-50 ("Parking in Alleys Prohibited") provides that: "It shall be unlawful for any person to stop, stand or park a vehicle in any alley." Opp'n at 3.

[2] Defendant is not charged in this case with possession of a controlled substance, though the police report indicates that the substance was booked into evidence. Dkt 27–1 & Ex. 1 at 17.

Robinson Decl., ¶ 10 & Ex. 1 at 10. Robinson then searched the rest of the vehicle to locate any other drug related contraband. Robinson Decl., ¶ 11.

Because defendant was unlicensed, had been arrested, and the registered owner was not present, Robinson concluded that the Infiniti had to be impounded. Id. ¶ 12. Additionally, the vehicle was blocking an alley and was located in an unsafe neighborhood with recent rise in armed robberies and gang activity. Id. ¶ 14. Accordingly, Robinson took inventory of the Infiniti and impounded the vehicle pursuant to the Inglewood Police Department's "Vehicle Towing and Release Policy." Id. ¶ 15, Ex. 2.

During the inventory search, Robinson found a gray "Sentry" lock box in the back seat sitting on top of a black and white backpack. Id. ¶ 15; Report at 10. He removed the items from the Infiniti and asked defendant and the passenger, "Whose stuff is this?" Id. Defendant replied, "That's all mine sir." Id. Robinson searched the backpack and found a small silver key in the front compartment of the backpack. Robinson Decl., ¶ 15. He used the key to see if it would open the lock box, which it did. Id. The box contained a fully-loaded semi-automatic pistol among other items. During the booking process, officers strip searched defendant and found $860 in counterfeit currency on his person. Id., ¶ 16; Dkt. 27–1 & Ex. 1 at 11–12.

### B. Defendant's Declaration

Defendant states that on October 23, 2017, he was sitting in a parked vehicle near 104th Street and 10th Avenue in Inglewood. He was talking to a friend who was sitting in the passenger seat. Dkt. 25-1, Declaration of John Christopher Magdirila ("Magdirila Decl.") ¶ 2. The vehicle was parked in an alley with the engine off. Defendant did not have his foot on the brake, though the headlights may have been on. The vehicle had dealer plates. Id. ¶ 3.

A patrol vehicle pulled up on the right side of defendant's vehicle. Id. ¶ 4. The patrol vehicle did not have its lights or sirens activated. Id. From their patrol vehicle, the officers started asking defendant and his friend questions, including whether they were on parole, and they said no. Id. When one of the officers got out of the patrol vehicle, defendant's friend got out of the vehicle with his hands up and was immediately handcuffed. Id. Defendant recalled two or three patrol vehicles arriving at this time and there were at least four officers on the scene. Id. ¶ 5.

When an officer approached the vehicle from the driver's side, defendant put his hands up, although he remained seated. Id. ¶ 6. He was then taken out of the vehicle and placed in handcuffs. Id. Defendant and his friend were detained at the front of the patrol vehicle parked behind their vehicle. Id. Two officers remained with them while they were handcuffed. Other officers at the scene searched the vehicle. Id. ¶¶ 6–7. At one point an officer asked defendant about a backpack found in the rear seat. Id. ¶ 7. The officer wanted to know who it belonged to, and defendant said that it was his. Id. They said "great, this is your gun too since we found

a key in the backpack that fit the lock to the lock box." Id. ¶ 7. Defendant does not recall being advised of his Miranda rights until he got to the police station. Id. ¶ 8.

## III. DISCUSSION

Defendant moves to suppress all evidence and statements obtained as a result of his allegedly unlawful arrest, search and questioning. Defendant argues that (1) the officers unreasonably prolonged the traffic stop; (2) the officers had no right to arrest defendant for being unlicensed; (3) the automobile exception does not apply because the officers did not have probable cause to search the vehicle; (4) the vehicle search was not a valid search incident to arrest; (5) the vehicle search was not a valid parole search; (6) the inventory search was a merely a post-hoc justification for an otherwise unlawful search; (7) defendant's statements should be suppressed under Miranda; and (8) the evidence seized during his strip search should be suppressed as the fruit of the prior unlawful arrest and search. See Motion.

The government argues that (1) defendant has failed to establish standing to challenge the search and seizure in this case; (2) defendant's traffic violations created reasonable suspicion for the stop; (3) defendant's arrest was valid pursuant to Vehicle Code § 14602.6(a)(1); (4) the search of the glove compartment was reasonable both as a search incident to arrest and as a parole search; (5) the subsequent search was reasonable under the automobile exception; (6) defendant was not subject to "custodial interrogation" for Miranda purposes; and (7) the discovery of the evidence was inevitable because the Infiniti was impounded and subject to an inventory search. See Opp'n.

### A. Whether the Traffic Stop Was Lawful

Though an individual "has no reasonable expectation of privacy in a car" in which he has no possessory interest, and therefore, lacks standing to challenge the search of the car, defendant "may challenge a stop of a vehicle on Fourth Amendment grounds."[3] United States v. Twilley, 222 F.3d 1092, 1095 (9th Cir. 2000) (alteration and internal quotation marks omitted). Thus, "[u]nder Twilley, [a] defendant has standing to challenge the legality of the initial traffic stop, and to suppress any fruits of that stop if the initial stop was unlawful." United States v. Rodriguez, 100 F. Supp. 3d 905, 919 (C.D. Cal. 2015); see also United States v. Colin, 314 F.3d 439, 442–43 (9th Cir. 2002) ("We have held that occupants of a vehicle have standing to challenge on Fourth Amendment grounds an officer's stop of their vehicle even if they have no possessory or ownership interest in the vehicle."); 6 W. LaFave, Search & Seizure § 11.3(e) (5th ed. 2012) ("Quite obviously, a driver nonowner . . . has standing regarding the stopping of the vehicle or his removal from it.").

---

[3] The parties dispute whether defendant has standing under the Fourth Amendment to challenge the officers' search of the Infiniti. The Court need not resolve this dispute in light of its conclusions below.

A traffic stop supported by reasonable suspicion that a traffic violation has occurred does not violate the Fourth Amendment. United States v. Willis, 431 F.3d 709, 714–16 (9th Cir. 2005). Courts do not "second-guess the reasons for the officer's stop." Id. at 716 (citing Whren v. United States, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.")).

Here, the officers provided two justifications for the stop: (1) the Infiniti was parked in an alley in violation of Inglewood Municipal Code 3-50; and (2) the Infiniti did not have license plates in violation of Vehicle Code Section 5200(a), which states in pertinent part, "License plates . . . shall be mounted in a position so as to be clearly visible." Opp'n at 6. These observed traffic violations warranted reasonable suspicion to initiate the initial traffic stop. See United States v. Lopez–Soto, 205 F.3d 1101, 1104 (9th Cir. 2000) ("Where the government seeks to justify a traffic stop incident to a traffic violation, the government must demonstrate that the law enforcement official initiating the stop had, at least, reasonable suspicion that a traffic violation had occurred.); Choudhry, 461 F.3d 1097 ("A traffic violation alone is sufficient to establish reasonable suspicion.") (citations omitted). The Court finds no facts in the record that contradict the officers' observations that the Infiniti was illegally parked in an alleyway and that it was without proper license plates. See U.S. v. King, 244 F.3d 736, 738 (2001) ("We have upheld reasonable suspicion when an officer was correct about the traffic law and the facts observed.") Accordingly, the Court finds that the officers had reasonable suspicion that the Infiniti committed a traffic violation and, as such, the traffic stop was warranted.

### B.     Whether the Traffic Stop Was Unreasonably Prolonged

Defendant argues that even if the government can prove that initial traffic stop was lawful, the officers unreasonably prolonged the stop. Motion at 5. In Rodriguez v. United States, 575 U.S. —, 135 S. Ct. 1609 (2015), the Supreme Court held that traffic stops can last only as long as is reasonably necessary to carry out the "mission" of the stop, unless police have an independent reason to detain the driver. The "mission" of a stop includes "determining whether to issue a traffic ticket" and "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. at 1615. "A stop that is unreasonably prolonged beyond the time needed to perform these tasks ordinarily violates the Constitution." United States v. Gorman, 859 F.3d 706, 714 (9th Cir. 2017). This is because "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren, 517 U.S. at 809–10. Accordingly, a traffic infraction provides "[a]uthority for the seizure" of the driver only until the "tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 135 S. Ct. at 1614. Thus, "[a] seizure justified only by a police-observed traffic violation . . . become[s] unlawful if it is prolonged beyond the time reasonably

required to complete" the stop's mission. Id. at 1611 (internal quotation marks and citation omitted).

The government maintains that, consistent with Rodriguez, the officers made "ordinary inquiries" including "checking the driver's license" and "determining whether there are outstanding warrants," during which defendant admitted that he did not have a driver's license and that the car did not belong to him. Opp'n at 8. The passenger also allegedly stated that he was on parole. Id. The government argues that the officers were therefore obligated at this point to further investigate the situation. Id.

It is unclear from the record precisely how much time elapsed between the initiation of the stop and the point when the officers confirmed that the passenger was a parolee and defendant was an unlicensed driver. At the evidentiary hearing, Robinson testified that after initiating the stop he heard the car engine running and saw that the brake lights were illuminated. Robinson testified that he approached defendant and asked whether he had a driver's license; when defendant responded that he did not, Robinson asked defendant to get out of the car and placed him in handcuffs. Robinson, who was responsible for conducting the vehicle search, testified that he subsequently searched the glove compartment for "a few reasons"—to confirm whether the registered owner's name matched the name that defendant provided, and to determine whether the passenger was in compliance with parole. Additionally, based on Villicana's testimony at the evidentiary hearing, the "inventory" of the vehicle occurred within minutes of the stop and the inventory search took "minutes."

Given the officers' testimony at the evidentiary hearing, it appears that the stop and ensuing glove compartment search to verify defendant's representations and the passenger's parole compliance happened in quick succession. After defendant admitted that the Infiniti did not belong to him and that he did not have a driver's license, Robinson placed defendant in handcuffs. Robinson Decl. ¶ 8. Robinson then "continued his investigation and searched the glove compartment to look for ownership information of the car and parole compliance check." Id. ¶ 10. The Court finds that the glove compartment search was part of Robinson's traffic stop "mission," which includes "checking the driver's license … and inspecting the automobile's registration and proof of insurance." See Rodriguez, 135 S. Ct. 1609 ("Typically such inquiries involve checking the driver's license … and inspecting the automobile's registration and proof of insurance.")

After Robinson searched the glove compartment as part of his traffic stop mission, whether the stop was prolonged due to Robinson's subsequent search of the entire vehicle depends upon whether reasonable suspicion of criminal activity permitted prolonging the stop beyond the time reasonably required to complete the issuance of a warning ticket. See Rodriguez, 135 S.Ct. 1609 at 1614–15. Reasonable suspicion "exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences,

form a basis for *particularized* suspicion." United States v. Montero–Camargo, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). Once Robinson opened the glove compartment, he found a "bag of white crystalline substance resembling methamphetamine." Robinson Decl. ¶ 10. This bag of white crystalline substance—which resembled methamphetamine based on Robinson's training and experience—demonstrates that Robinson had a legitimate basis for reasonable suspicion of criminal activity sufficient to permit a prolonged stop. Accordingly, the Court finds that defendant cannot establish that the stop was unreasonably prolonged.

### C. Whether the Search of the Vehicle Was Lawful

Assuming arguendo that defendant demonstrates a possessory interest in the Infiniti, a warrantless vehicle search is presumptively unreasonable and the government must prove that an exception to the warrant requirement applies. See United States v. Huguez-Ibarra, 954 F.2d 546, 551 (9th Cir. 1992).

#### 1. Whether the Officer's Conducted a Valid Inventory Search

Defendant argues that the officers' "so-called inventory search" was merely a post-hoc justification for an otherwise unlawful search. Motion at 9. Under the community caretaking exception, "police officers may impound vehicles that jeopardize public safety and the efficient movement of vehicular traffic." Miranda v. City of Cornelius, 429 F.3d 858, 864 (9th Cir. 2005). Even so, defendant argues that vehicle impounds and inventory searches cannot serve as post-hoc justifications for a search—they must be conducted according to standard operating procedures. Motion at 9 (citing Florida v. Wells, 495 U.S. 1, 4 (1990)). "Once a vehicle has been legally impounded, the police may conduct an inventory search, as long as it conforms to the standard procedures of the local police department." United States v. Cervantes, 703 F.3d 1135, 1141 (9th Cir. 2012). The government bears the burden of presenting evidence that the impound served a caretaking function. See United States v. Caseres, 533 F.3d 1064, 1074-75 (9th Cir. 2008).

The government argues that the search of the Infiniti was a valid inventory search because the officers' community caretaking obligations were triggered. Opp'n at 14. The government notes that the Infiniti was located in a dangerous neighborhood, where there were recent reports of armed robberies and increased gang activity, and the car was blocking an alley. Id. The IPD Vehicle Towing and Release Policy ("Towing Policy") instructs that "[a]ll property in a stored or impounded vehicle shall be inventoried and listed on the vehicle storage form. This includes the trunk and any compartments or containers, even if closed and/or locked." Robinson Decl., ¶ 15, Ex. 2.

##### a. Whether the Vehicle was Legally Impounded

Under the community caretaking exception to the Fourth Amendment's warrant requirement, "[w]hether an impoundment is warranted depends on the location of the vehicle

and the police officers' duty to prevent it from creating a hazard to other drivers or being a target for vandalism or theft." Miranda v. City of Cornelius, 429 F.3d 858, 864 (9th Cir. 2005) (internal quotation marks omitted); see also United States v. Jensen, 425 F.3d 698, 706 (9th Cir.2005) ("Once the arrest was made, the doctrine allowed law enforcement officers to seize and remove any vehicle which may impede traffic, threaten public safety, or be subject to vandalism."); Hallstrom v. City of Garden City, 991 F.2d 1473, 1477, n.4 (9th Cir. 1993) (impoundment of arrestee's car from private parking lot "to protect the car from vandalism or theft" was reasonable under the community caretaking function). Thus, "[a] driver's arrest . . . is not relevant except insofar as it affects the driver's ability to remove the vehicle from a location at which it jeopardizes the public safety or is at risk of loss." Miranda, 429 F.3d at 864.

Here, the record demonstrates that the officers impounded the Infiniti because "the owner of the car was not present, the [defendant] was unlicensed and did not have any evidence that he was authorized to drive the car, and the car was parked in and blocking an alley in violation of Inglewood Municipal Code 3–50."[4] Robinson Decl. ¶ 12. In addition, Robinson asserts in his declaration that "the neighborhood was not a safe place to leave the car, which was a luxury car with no permanent license plates." Robinson Decl. ¶ 12. The record reflects that Robinson impounded the Infiniti pursuant to the IPD's "Vehicle Towing and Release Policy." Id. ¶ 13.

Given the above considerations, it appears the Infiniti was properly impounded pursuant to the community caretaking exception. In particular, the officers demonstrate that they impounded the Infiniti to prevent theft, that there was an apparent lack of an immediately available licensed driver authorized to take custody of the vehicle, and that the area in which the vehicle was parked was purportedly a high-crime area—all of which justified impoundment of the Infiniti and initiation of an inventory search under the community caretaking exception. See Ramirez v. City of Buena Park, 560 F.3d 1012, 1025 (9th Cir. 2009) ("Leaving [defendant's] car in the drugstore parking lot would have made it an easy target for vandalism or theft" such that the officer's "concern that [the city] might be held liable if [defendant's] car was stolen, vandalized, or some harm came to it was reasonable"); Hallstrom v. City of Garden City, 991 F.2d 1473, 1477 n.4 (9th Cir. 1993) ("[I]t was not unreasonable for the arresting officers to protect the car from vandalism or theft by having it towed" from a parking lot.); United States v. Jensen, 425 F.3d 698, 706 (9th Cir. 2005) (officer's concerns about vandalism were reasonable).

---

[4] At the evidentiary hearing, Robinson testified that he confirmed the name of the vehicle's registered owner during his glove compartment search, although he did not attempt to contact the owner. It is not clear from the record why Robinson did not attempt to contact the owner, or whether another officer present at the scene attempted to contact the owner.

In addition, Robinson testified at the hearing that the Infiniti was impounded from the moment that defendant admitted that he did not have a driver's license. The Court finds this testimony to be credible, particularly given the IPD's Towing Policy, which provides that "when an officer has determined a driver is [] unlicensed … the driver will be issued a citation accordingly and the vehicle shall be towed." Dkt. 27–1 & Ex. 2 at ECF 34. Moreover, the officers were not required to tow the vehicle[5] from the parking lot before initiating the inventory search due to the purportedly high-crime area and the fact that the traffic stop occurred at approximately 23:00 hours. See United States v. Penn, 233 F.3d 1111, 1117 (9th Cir. 2000) (holding that an inventory search conducted in accordance with applicable policy and completed before a vehicle was towed was constitutional); Cf. United States v. Prescott, 599 F.2d 103, 104 (5th Cir. 1979) (affirming nighttime inventory search while vehicle was still on the highway awaiting towing and holding that "[p]olice may lawfully conduct such searches while the vehicle is still on the highway awaiting towing, a precaution that may be necessary to protect the property, the police or the public while the vehicle is abandoned, or even while it is being towed."). Therefore, having found that impoundment of the Infiniti and initiation of the investigatory search were legally justified, the Court turns to the question of whether the search was properly conducted.

### b. Whether the Vehicle Search Was Properly Conducted

"Once a vehicle has been legally impounded, the police may conduct an inventory search, as long as it conforms to the standard procedures of the local police department." Cervantes, 703 F.3d at 1141 (citation omitted); United States v. Caseres, 533 F.3d 1064, 1074 (9th Cir. 2008) ("A lawfully impounded vehicle may be searched for the purpose of determining its condition and contents at the time of impounding. Anything observed in the vehicle during the inventory search is admissible against the defendant.") (internal citation omitted). However, "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." Florida v. Wells, 495 U.S. 1, 4 (1990).

Defendant contends that the officers engaged in a "generalized rummaging expedition of the car." Motion at 10. In turn, the government argues that Robinson followed the IPD's Towing Policy, which provides in section 510.4 that "[a]ll property in a stored or impounded vehicle shall be inventoried and listed on the vehicle storage form. This includes the trunk and

---

[5] The police report notes that the tow truck was requested on October 24, 2017—the day *after* the October 23, 2017 traffic stop. At the evidentiary hearing, Officer Villicana testified that he called a tow truck after the investigation was completed, and that he filled out California Highway Patrol Vehicle Report CHP 180, a standardized form for towing or storing a vehicle, at approximately 23:00 hours on October 23, 2017. Based on Villicana's testimony, it appears that that the tow truck was called at some point soon after the traffic stop ended on October 23, 2017.

any compartments or containers, even if closed and/or locked." Opp'n at 14. Furthermore, section 510.2.1 of the Towing Policy provides that when officers request a towing, storage, or impound of a vehicle, they

> shall complete CHP Form 180 and accurately record the mileage and a description of property within the vehicle (Vehicle Code § 22850). A copy of the storage report should be given to the two truck operator and the original shall be submitted to the Records Division as soon as practicable after the vehicle is stored.

Dkt. 27–1 & Ex. 2 at ECF 32. Defendant does not specifically argue that the officers failed to comply with IPD's Towing Policy. In contrast, the government asserts that Robinson followed the written protocol requiring him to inventory and list all property stored in the vehicle. Opp'n at 14; Robinson Decl. ¶ 13. At the evidentiary hearing Villicana testified that he completed CHP Form 180 to document the property found during Robinson's inventory search.

     Upon consideration of the relevant testimony and evidence, nothing in the record indicates that the officers deviated from the applicable Towing Policy. The record demonstrates that Robinson conducted an inventory search of the Infiniti pursuant to the "Vehicle Inventory" requirements set forth in section 510.4 of Towing Policy, and that Villicana completed CHP Form 180 pursuant to the "Vehicle Storage Report" requirements set forth in section 510.2.1. The vehicle impoundment and search was therefore permissible under the community caretaking exception.[6]

     Accordingly, the Court **DENIES** defendant's motion to suppress the methamphetamine, loaded semi-automatic pistol, and other evidence found in the Infiniti.[7]

---

[6] Assuming that the community caretaking exception were not applicable, the evidence found in the car would nevertheless be subject to the inevitable discovery exception to the exclusionary rule. "The inevitable discovery exception to the exclusionary rule is available when the government demonstrates, by a preponderance of the evidence, that it would inevitably have discovered the incriminating evidence through lawful means." United States v. Lopez-Soto, 205 F.3d 1101, 1106 (9th Cir. 2000). Here, the record reflects that the officers could not release the Infiniti back to defendant, who was an unlicensed driver, and that the registered owner was not present to remove the vehicle. The Court thus finds that the officers were obligated to impound the Infiniti under the IPD's Towing Policy, and once lawfully impounded, the officers were obligated to complete a CHP Form 180, subject to section 510.2.1 of the Towing Policy. Therefore, the Court finds that even if the firearm and bag of methamphetamine were in some way subject to the exclusionary rule, the inevitable discovery exception is applicable here.

[7] In light of the Court's conclusion that the officers' vehicle search was warranted under the community caretaking exception, and that, *arguendo*, the inevitable discovery rule is also

**D.**     **Whether Defendant's Arrest Was Lawful**

The Court next determines whether defendant's arrest was lawful given that $860 in counterfeit money was found in defendant's possession during his booking process, and defendant was subsequently indicted on five counts of passing, uttering, and possessing counterfeit obligations in violation of 18 U.S.C. section 472.

With respect to the lawfulness of his arrest, defendant argues that "[e]ven if the officers had a right to ask him for his driver's license and reach their specious conclusion that he was 'in operational control' of the car (*thus* driving without a license), they had no right to arrest him when he told them he had no license." Motion at 6. Defendant relies on Vehicle Code section 12801.5(e), which provides that "[n]otwithstanding Section 40300 or any other law, a peace officer *shall not* detain or arrest a person solely on the belief that the person is an unlicensed driver, unless the officer has reasonable cause to believe the person driving is under 16 years of age." (emphasis added). Defendant argues that the $860 in counterfeit bills in his possession are "fruits" of his illegal arrest and must be suppressed.

In opposition, the government argues that Vehicle Code section 12801.5(e) does not render defendant's arrest unconstitutional for two reasons. First, the government contends that defendant was not arrested "solely on the belief" that he was unlicensed. Opp'n at 8. Rather, the government asserts that he was "confirmed to be unlicensed," which is an arrestable offense. Id. For example, Vehicle Code section 14602.6(a)(1) provides that, "[w]henever a peace officer determines that a person was . . . driving a vehicle without ever having been issued a driver's license, the peace officer may either immediately arrest that person and cause the removal and seizure of that vehicle." The government notes that Vehicle Code section 12801.5(e) is limited "notwithstanding Section 40300 or *any other law*" (emphasis added). Second, the government argues that even if the officers should not have arrested defendant pursuant to Vehicle Code section 12801.5(e), this violation does not render the arrest unconstitutional under the Fourth Amendment in light of Virginia v. Moore, 553 U.S. 164 (2008). Opp'n at 9.

An arrest is valid under the Fourth Amendment if it is supported by probable cause. See Moore, 553 U.S. 164 at 173. To determine whether probable cause exists at the time of an arrest, the Ninth Circuit considers "whether at that moment the facts and circumstances within [the Officers'] knowledge … were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Edgerly v. City & Cty. of San Francisco, 599 F.3d 946, 953 (9th Cir. 2010) (citation omitted). The probable cause requirement creates an objective standard; independent scrutiny of the record can establish probable cause regardless of the arresting officer's belief. United States v. Moses, 796 F.2d

---

applicable, the Court need not also address the parties' arguments regarding whether the vehicle search was independently justified by the automobile exception, by parole search, or by search incident to arrest.

281, 285 (9th Cir. 1986). Thus, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Whren v. United States, 517 U.S. 806, 813 (1996).

As an initial matter, Robinson's police report demonstrates that defendant violated Vehicle Code § 12500(a), which provides that "[a]person may not drive a motor vehicle upon a highway, unless the person then holds a valid driver's license issued under this code." See Dkt, 27–1 at ECF 11. Regardless of the statutory basis for defendant's arrest and whether his arrest was permissible under California law, the Supreme Court's analysis in Moore controls the validity of defendant's arrest. In Moore, the Supreme Court held that "warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and … state restrictions do not alter the Fourth Amendment's protections." 553 U.S. 164 at 176. In that case, the Court held that police officers did not violate the Fourth Amendment by arresting a motorist whom they had probable cause to believe had violated Virginia law by driving with a suspended license, even though, under Virginia law, this misdemeanor offense of driving with a suspended license was one for which officers should have issued summons rather than make an arrest. Id. at 167. The Court concluded that the "officers' violation of state law in making arrest did not affect its reasonableness, for Fourth Amendment purposes." Id. In particular, the Court observed that when "an officer has probable cause to believe a person committed even a minor crime in his presence," then "the arrest is constitutionally reasonable." Id. at 171.

Upon review of the record, the Court concludes that the officers had probable cause to believe that defendant was driving without a license in violation of Vehicle Code section 12500(a). Although defendant stated in his declaration that he did not have his foot on the brake and that the engine was off—which he confirmed at the evidentiary hearing—the officers' testimony is to the contrary. See Magdirila Decl. ¶ 3. Robinson states in his declaration that when he and Villicana observed the Infiniti in the alleyway, the vehicle "was stopped, but the engine was running and the rear tail stop lights were illuminated as if the driver had the foot on the brake," and defendant admitted that he did not have a driver's license. Robinson Decl. ¶¶ 6, 8. At the evidentiary hearing, Robinson confirmed that he was certain that the brake lights were illuminated and that that he heard the engine running. Villicana testified at the evidentiary hearing that he, too, saw that the brake lights were illuminated and heard the engine running.

In light of the officers' testimony, which the Court finds credible, the Court concludes that the officers' observations that the Infiniti's engine was running and that the brake lights were activated were sufficient to support their belief that defendant, who was sitting in the driver's seat, was in operational control of the vehicle and was therefore driving without a license. Thus, the officers had probable cause to believe that defendant committed a "minor crime" of driving without a license, in violation of Vehicle Code section 12500(a). Given the Supreme Court's reasoning in Moore that probable cause that a law has been broken permits warrantless arrests—which "extends even to minor misdemeanors"—the Court finds that

defendant's arrest for driving without a license was constitutionally permissible under the Fourth Amendment. This conclusion is warranted notwithstanding defendant's argument that California law prevents a peace officer from arresting an individual solely on the belief that the individual is an unlicensed driver. See id.; cf. Cal Veh. Code §§ 12500(a); 12801.5(e); see also Edgerly v. City & Cty. of San Francisco, 599 F.3d 946, 956 (9th Cir. 2010) (holding that, in light of Moore, a defendant's arrest for trespass was constitutional even though defendant's arrest was unauthorized under applicable state law). Accordingly, the Court **DENIES** defendant's request to suppress the $860 in counterfeit money that was found in his possession during his booking process as a result of his arrest.

### E.  Whether Defendant's Statements Should Be Suppressed

In addition, defendant argues that his statements made at the scene of his arrest should be suppressed pursuant to Miranda v. Arizona, 384 U.S. 436, 444 (1966). Motion at 10. Defendant states that he does not recall receiving Miranda advisements at least until he arrived at the police station. Magdirila Decl. ¶ 8. The officers do not state in their declarations that defendant was Mirandized at any time during their investigation and search of the vehicle. Defendant therefore argues that his statements admitting ownership of various items should be suppressed. Motion at 10.

The government first argues that defendant was not "in custody" when he was asked whether the items in the vehicle belonged to him. Opp'n at 12 n.1. The government notes that "handcuffing a suspect does not necessarily dictate a finding of custody" for Miranda purposes. United States v. Booth, 669 F.2d 1231, 1236 (9th Cir. 1981); see also United States v. Cervantes-Flores, 421 F.3d 825, 830 (9th Cir. 2005) ("By handcuffing [defendant, police] did not convert the *Terry* stop into a custodial arrest."). Thus, the government appears to argue that defendant was not under formal arrest. The government also notes that the officers never told the defendant that he was under arrest. Opp'n at 13. Defendant, on the other hand, argues that there is little doubt he was "in custody" when the officers conducted their search because the officers state in their declarations that defendant was immediately handcuffed and had been arrested as soon as they determined he did not have a license. Motion at 10.

Second, the government argues that defendant was not subject to "interrogation" because an officer conducting a Terry stop may "ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." Berkemer v. McCarty, 468 U.S. 420, 438 (1984). Accordingly, courts have held that general "on-the-scene" questioning does not constitute interrogation for purposes of Miranda. See, e.g., United States v. Davis, 530 F.3d 1069, 1081–82 (9th Cir. 2008) (holding that Miranda warnings were not required when police asked basic investigatory questions during the execution of the search warrant); Vickers v. Stewart, 144 F.3d 613, 616 (9th Cir. 1998) (suggesting that "on-the-scene questioning" is not subject to the Miranda requirement).

Defendant argues that this was not a Terry stop but rather a full custodial arrest, and when the officers "questioned him about who owned the guns and drugs, they were certainly seeking to obtain an incriminating statement." Motion at 10.

The "touchstone" for Miranda warnings is whether the suspect was in custody when interrogated. United States v. Barnes, 713 F.3d 1200, 1205 (9th Cir. 2013). To determine whether an individual was in custody, the Court must examine the totality of the circumstances. See Thompson v. Keohane, 516 U.S. 99, 112 (1995). The test is whether "a reasonable innocent person in such circumstances would conclude after brief questioning [that] he or she would not be free to leave." United States v. Bassignani, 575 F.3d 879, 883–84 (9th Cir. 2009) (quoting United States v. Booth, 669 F.2d 1231, 1235 (9th Cir. 1981)). The Court considers the following factors when considering a custody analysis: (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. United States v. Barnes, 713 F.3d 1200, 1204 (9th Cir. 2013). In addition, "[t]he term 'interrogation' means 'any words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response.' " United States v. Washington, 462 F.3d 1124, 1132 (9th Cir. 2006) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).

At the evidentiary hearing, Robinson testified that after defendant told Robinson that he did not have a driver's license, Robinson asked defendant to get out of the Infiniti and placed defendant in handcuffs for "detention pending further investigation." Robinson also testified that defendant was not free to leave, although defendant was, in his opinion, not yet under arrest and not in custody.

Upon consideration of the totality of the circumstances, the Court finds that defendant was in custody for purposes of Miranda after he was placed in handcuffs and put in the police vehicle. This conclusion is warranted insofar as Robinson testified that defendant was "not free to leave," that defendant was placed in handcuffs and put in the police vehicle, and that defendant was asked an incriminating question—whether the bag of methamphetamine was his property—during his holding. These circumstances support the conclusion that a reasonable, innocent person would believe that he is not free to leave, particularly given the multiple police vehicles present at the scene, the use of handcuffs, and Robinson's questioning of defendant during his inventory search of the vehicle. See United States v. Estrada–Lucas, 651 F.2d 1261 (9th Cir. 1980) (reasoning that a defendant was in custody for purposes of Miranda when she was not free to leave and "evidence of [her] guilt was displayed prominently while" she was questioned). Moreover, Robinson's question concerning the bag of methamphetamine went beyond general "on-the-scene" questioning regarding ownership of the Infiniti and defendant's vehicle code offense. See Davis, 530 F.3d 1069 ("During a Terry stop, officers may ask the detainee a moderate number of questions to determine his identity and to try to obtain

information confirming or dispelling the officer's suspicions.") (citation and quotation omitted). In light of these circumstances, prior to any questioning the officers were obligated to provide defendant with a proper <u>Miranda</u> warning after he was handcuffed and placed in the police vehicle.

Accordingly, the Court **GRANTS** defendant's motion to suppress all statements made after defendant was handcuffed and placed in the squad car, which includes defendant's alleged admission that the bag of methamphetamine was his personal property.

## IV. CONCLUSION

In accordance with the foregoing, the Court **DENIES in part** and **GRANTS in part** defendant's motion to suppress. The Court denies defendant's request to suppress the evidence obtained as a result of the Infiniti search. The Court grants defendant's request to suppress all statements made subsequent to defendant's arrest and placement in the police vehicle, including defendant's alleged admission to possession of methamphetamine.

|  | 00 | : | 00 |
|--|--|--|--|
| Initials of Deputy Clerk | | CMJ | |